UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                                                    PLAINTIFF

v.                                                              CRIMINAL ACTION NO. 3:13-CR-00082-CRS

JOSE ANTONIO MORA-PIZARRO                                                                  DEFENDANT

## MEMORANDUM OPINION

I. Introduction

A federal grand jury indicted Defendant Jose Antonio Mora-Pizarro and his co-defendants for conspiring to "possess with the intent to distribute and distribute 1,000 kilograms or more" of marijuana. Indictment 1, ECF No. 15; *see also* Superseding Indictment 1, ECF No. 65 (adding one co-defendant).

Mora-Pizarro moved to suppress any and all statements that he made to law enforcement on May 16, 2013. Mem. Support. Mot. Suppress 1, ECF No. 127-1; Supplemental Mot. Suppress 1, ECF No. 216. The magistrate judge held an evidentiary hearing on the two motions. R. & R. 2, ECF No. 254. During the evidentiary hearing, the United States called two witnesses, and Mora-Pizarro did not call any witnesses. Transcript of Hearing 64, ECF No. 232. The magistrate judge recommended that this Court deny Mora-Pizarro's motion to suppress and supplemental motion to suppress. R. & R. 1, ECF No. 254. Mora-Pizarro objects to the magistrate judge's findings of fact, conclusions of law, and recommendation ("report and recommendation"). Obj. R. & R., ECF No. 260.

The Court will adopt the magistrate judge's report and recommendation in full. The Court will deny Mora-Pizarro's motion to suppress and supplemental motion to suppress any and all statements that he made to law enforcement on May 16, 2013.

II. Legal Standard

The Court shall make a de novo determination of the proposed findings or recommendations to which Mora-Pizarro objected. *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Crim. P. 59(b)(3).

III. Background

The magistrate judge accepted the following facts based upon the testimony presented at the evidentiary hearing of Deputy Sheriff Matthew Salsman and Deputy Sheriff Thomas Perryman.

At approximately 8:30 am on May 16, 2013, Mora-Pizarro was stopped by Deputy Salsman for the alleged traffic violation of following another vehicle too closely. R. & R. 3, ECF No. 254. Deputy Salsman stopped Mora-Pizarro after Special Agent Brian Bester ("SA Bester") of the Drug Enforcement Administration ("DEA") had told him to be "on the lookout" for a tractor-trailer matching the description of Mora-Pizarro's. *Id.* SA Bester had not provided Deputy Salsman with any information as to which direction the tractor-trailer would be traveling or any alleged illegal activity that would support a traffic stop, and Deputy Salsman had not asked why SA Bester was interested in the vehicle. *Id.*

When Deputy Salsman observed the vehicle driven by Mora-Pizarro to be following 50 to 100 feet behind another vehicle, in violation of a law requiring at least 250 feet of space between a tractor-trailer and another vehicle, he began following Mora-Pizarro. *Id.* at 4. After several minutes, Deputy Salsman purportedly observed the tractor-trailer following another

vehicle too closely and activated his emergency equipment. *Id.* After stopping the vehicle, Deputy Salsman approached Mora-Pizarro and asked for his commercial driver's license ("CDL"), log book, and registration in English. *Id.* at 4, 9. All interactions between Deputy Salsman and Mora-Pizarro were conducted in English, and it appeared to Deputy Salsman that Mora-Pizarro had no trouble understanding English. *Id.* at 9. At some point soon after Deputy Salsman stopped Mora-Pizarro, two other officers arrived at the scene in two separate vehicles. *Id.* at 4–5. Deputy Salsman returned to his vehicle to review the records provided by Mora-Pizarro. *Id.* at 5.

After reviewing the records, Deputy Salsman approached Mora-Pizarro's vehicle again and asked from where he was coming. *Id.* Mora-Pizarro stated that he had driven a load of cargo from McAllen, Texas to Lexington, Kentucky, but that when he arrived, the receiving entity refused to accept three pallets of onions. *Id.* Mora-Pizarro further stated that his broker advised him to drive to Louisville and meet a man in a white Chevy Impala at the Love's Truck stop at Exit 116, and that individual would purchase the onions. *Id.* Deputy Salsman testified that this explanation raised his suspicions because trucking brokers typically make deals with other brokers, rather than with members of the general public. *Id.*

Deputy Salsman testified that his suspicions were also raised by discrepancies in the log book and bill of lading provided by Mora-Pizarro. *Id.* at 6. It is unclear from the official transcript of the evidentiary hearing when or how Deputy Salsman obtained the bill of lading. The magistrate judge determined that Deputy Salsman had obtained possession of the bill of lading early on in the stop because he testified that his suspicions that were raised in inspecting it led to his questioning of Mora-Pizarro. *Id.* at 21 n.5. The discrepancies included: (1) Mora-Pizarro wrote in his log book that he was driving from McAllen, Texas to Louisville, but the bill

3

of lading provided he was going to Lexington; (2) the bill of lading stated that the trailer's cargo was onions and cabbage to be kept at 50 degrees Fahrenheit, but based on Deputy Salsman's training and experience such cargo should be transported at 32 to 35 degrees Fahrenheit; and (3) the bill of lading stated that the vehicle was carrying 18 pallets, but based on Deputy Salsman's training and experience a trailer of that size should be able to carry 26 pallets, making the load economically inefficient. *Id.* at 6.

Deputy Salsman noted two other discrepancies in his testimony: (1) Mora-Pizarro's log noted that he was in the sleeper berth of his truck from 1500 hours to 0230 hours on May 14, 2013, but a license plate reader in Texas provided that he was actually driving at that time; and (2) Mora-Pizarro's log stated that on May 15, 2013 he drove from Sulfur Springs, Texas to Kingston, Arkansas over a 9.5 hour period, but according to Deputy Salsman such a drive should take 6.5 hours at most. *Id.* at 6–7.

Deputy Salsman did not advise Mora-Pizarro of his *Miranda* rights. *Id.* at 8. He testified that Mora-Pizarro was not free to leave and he would have stopped Mora-Pizarro had he attempted to leave. *Id.* Deputy Salsman described the tone of his conversation with Mora-Pizarro as very cordial and friendly, said Mora-Pizarro was very outgoing and personable, but he also said that Mora-Pizarro appeared to be nervous throughout their encounter. *Id.* at 9. Deputy Salsman asked Mora-Pizarro if he had any marijuana, heroin, cocaine, methamphetamine, or large amounts of United States currency in his vehicle. *Id.* at 7. Mora-Pizarro responded that he did not. *Id.* Deputy Salsman asked for permission to search the tractor-trailer. *Id.* He did not recall telling Mora-Pizarro that he was not required to consent to the search. *Id.* Mora-Pizarro consented to the search, and Deputy Salsman searched both the cab and the trailer, which took

4

approximately 45 minutes to one hour. *Id.* The search did not result in discovery of evidence of illegal activity. *Id.*

Despite the lack of evidence discovered in the search, Deputy Salsman testified that he knew there was criminal activity involved due to the discrepancies in the log book and bill of lading. *Id.* He contacted Kentucky Vehicle Enforcement ("KVE") at approximately 10:30 am. *Id.* Mora-Pizarro waited outside his truck for KVE to arrive without interacting with any of the officers. *Id.* at 7–8. When KVE arrived, they took Mora-Pizarro's tractor-trailer out of service and instructed him to move his vehicle to a McDonald's restaurant. *Id.* at 8. Mora-Pizarro drove his vehicle to that location and KVE personnel and Deputy Salsman followed. *Id.* When they arrived at the restaurant, SA Bester told Deputy Salsman that 4,800 pounds of marijuana had been found at the location Mora-Pizarro had left before he was stopped. *Id.*

Mora-Pizarro was subsequently arrested and taken to the Louisville DEA offices, where he was interrogated in Spanish by Deputy Perryman. *Id.* at 9–11. Before asking any questions, Deputy Perryman advised Mora-Pizarro of his *Miranda* rights orally and by having Mora-Pizarro read his rights in Spanish from a DEA form. *Id.* at 10 (referencing Government Ex. 1, ECF No. 235). Mora-Pizarro checked off on the DEA form that he had read the form and had the form read to him, and he signed the form waiving his *Miranda* rights. *Id.* at 10–11.

According to Deputy Perryman, Mora-Pizarro stated that his occupation is hauling apples from Yakima, Washington to San Antonio, Texas. *Id.* at 12. He left Yakima on May 3, 2013 and delivered a load of apples to San Antonio on May 8, 2013. *Id.* After waiting a few days for cargo in Texas, he was directed to receive a shipment in McAllen, Texas. *Id.* He left his "box" at a loading facility there, and, when he returned, the box was sealed. *Id.* He was directed to deliver

5

the shipment to Lexington, Kentucky. *Id.* He stated he was not aware of any marijuana in the truck and did not look inside because the box had been sealed. *Id.* at 12–13.

    IV.    <u>Analysis</u>

The Court will address Mora-Pizarro's objections to the magistrate judge's report and recommendation in turn.

First, Mora-Pizarro apparently objects to the magistrate judge's finding of fact that SA Bester provided Deputy Salsman with only a description of the tractor-trailer, without providing any information as to any alleged illegal activity that would support a traffic stop. Obj. R. & R. 1, ECF No. 260 ("Initially, this Court can take judicial notice that that [sic] is naïve to believe that nothing was mentioned to Salsman as to why he was being asked to 'be on the lookout.'"). The Court disagrees. On direct examination, Deputy Salsman testified that he had "talked to Agent Bester earlier that morning, and he just gave [Deputy Salsman] information about the description of the truck, just to be on the lookout for it." Transcript of Hearing 6, ECF No. 232. When asked whether SA Bester had given him any information about illegal activities, Deputy Salsman responded in the negative. *Id.* On cross-examination, the following exchange took place:

> Q.    And, again, I think you said that you did not, but to make sure that I understood you correctly, you had no information from Agent Bester as to why you were being asked to keep a lookout for this vehicle and stop if probable cause exists?
> A.    Correct.
> Q.    Did you inquire – I realize he didn't say anything to you. Did you inquire of him?
> A.    I didn't. I get numerous calls like that on a daily basis about different vehicles. It really didn't raise any suspicion or anything to me.

*Id.* at 22–23. This testimony was consistent, unimpeached, and undisputed. Based on this testimony, the magistrate judge correctly found that Deputy Salsman was provided only with a

description of the tractor-trailer and told to be "on the lookout." Upon conducting a de novo review of the transcript, the Court will adopt the magistrate judge's finding.

Second, Mora-Pizarro objects to the magistrate judge's finding of fact that Mora-Pizarro provided Deputy Salsman with his bill of lading early in the stop. Obj. R. & R. 3, 5–6, ECF No. 260. Mora-Pizarro asserts for the first time in his objection that "it is obvious that Salsman took the bill of lading from Mora-Pizarro's cab" during the Deputy's search of said cab and trailer. *Id.*[1] Mora-Pizarro further argues that when he gave consent for the search of his truck, the scope of the consent was limited to the illegal items that Deputy Salsman asked about before requesting consent, specifically ". . . marijuana, heroin, cocaine and methamphetamine . . . also large amounts of United States currency." *Id.* at 2–3. Mora-Pizarro apparently argues that because the bill of lading was outside the scope of the consent search, the taking of the bill of lading was not a reasonable seizure and thus violated his Fourth Amendment rights. *Id.* at 3–4. Alternatively, Mora-Pizarro argues that his consent to the search was not voluntary because his documents were not returned to him and because he was not informed that refusal was an option. *Id.* at 4. Thus, he argues, all "questions and answers that resulted from the securing of that bill of lading were fruits of the poisonous tree of that Constitutional violation which must be suppressed." *Id.* at 5.

Mora-Pizarro's objection is directed at the portion of the report and recommendation which reads:

> With respect to the bill of lading, the Court has carefully reviewed the official transcript and is unable to determine precisely when Deputy Salsman obtained the bill of lading and whether he asked for it or whether Mora-Pizarro produced it along with his CDL, log book, and registration. Deputy Salsman's testimony

---

[1] Conversely, in Mora-Pizarro's reply memorandum, filed after the evidentiary hearing, he asserts that Deputy Salsman "demanded" his log book and bill of lading. Mora-Pizarro's Reply Mem. 2, 4, 6, 9, ECF No. 243; *see also* R. & R. 21 n.5, ECF No. 254.

> simply indicates that he had possession of the bill of lading early on in the stop because he was able to compare it to the log book, and such comparisons aroused a suspicion of criminal activity. Based on the evidence in the record, the Court cannot conclude that Deputy Salsman 'demanded' that Mora-Pizarro produce the bill of lading or otherwise acted improperly in obtaining it.

R. & R. 21 n.5, ECF No. 254. On de novo review of the transcript, this Court similarly does not find evidence of exactly when Deputy Salsman obtained the bill of lading, but finds that it was provided by Mora-Pizarro before the search of his truck. When asked the question, "So during your interactions with him, either initially when you first stopped him or when you went back and initiated a conversation with him after performing the checks, were your suspicions raised?," Deputy Salsman responded that his suspicions were raised by "[t]he discrepancies in the log book and the discrepancies in the bill of lading that he had provided me." Transcript of Hearing 12, ECF No. 232. From this question and answer, it appears to this Court that Mora-Pizarro provided Deputy Salsman with the bill of lading, rather than it having been seized during the search of Mora-Pizarro's truck. Moreover, based on the timing restrictions laid out in the question asked by counsel for the United States, it appears to this Court that Deputy Salsman had obtained the bill of lading before the search of Mora-Pizarro's truck. Because this Court finds that the bill of lading was not obtained as a result of the consent search, Mora-Pizarro's argument that seizure of the bill of lading was outside the scope of that search is moot. Moreover, because the search turned up no evidence of wrongdoing, Mora-Pizarro's argument regarding the voluntariness of the search is moot as well. Thus, this Court will adopt the magistrate judge's finding on this issue.

Third, Mora-Pizarro objects to the magistrate judge's conclusion that Mora-Pizarro was following a second vehicle too closely when Deputy Salsman pulled him over. Obj. R. & R. 7, ECF No. 260. Mora-Pizarro maintains that Deputy Salsman only alleges a violation of following

one vehicle too closely. *Id.* The Court disagrees. According to the evidentiary hearing transcript, Deputy Salsman observed Mora-Pizarro commit the traffic violation of "[f]ollowing too closely to another vehicle." Transcript of Hearing 5, ECF No. 232. But he did not activate his emergency equipment immediately. *Id.* at 21–22. Rather, he followed Mora-Pizarro for several minutes before activating the emergency equipment due to Mora-Pizarro's "[f]ollowing another vehicle too closely." *Id.* After Deputy Salsman's statement on cross-examination, counsel for Mora-Pizarro asked "Had he never, quote, in your opinion followed that vehicle – another vehicle too closely, how far would you have followed him?" *Id.* Deputy Salsman responded "I probably wouldn't have even pulled out on him initially if I didn't see the violation." *Id.* On de novo review, the wording in the transcript is ambiguous and can be interpreted to mean either that Deputy Salsman saw one violation and simply waited before activating his emergency equipment or that Deputy Salsman saw one violation and began following Mora-Pizarro, then saw another violation and activated his emergency equipment. Given that the magistrate judge was present during this testimony, he was in the best position to interpret the meaning behind these statements. Thus, this Court will defer to the judgment of the magistrate judge on this objection and will adopt the magistrate judge's conclusion.

Fourth, Mora-Pizarro objects to the magistrate judge's conclusion that under the four factors outlined in *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010), Mora-Pizarro was not "in custody" for purposes of *Miranda* rights. Obj. R. & R. 8–9, ECF No. 260. Mora-Pizarro attempts to distinguish *Hinojosa* from this case by pointing out that 1) the stop in this case occurred on the side of an interstate, rather than in a residence, 2) the questioning in this case lasted at least two hours and fifteen minutes, rather than only a few brief questions, and 3) in this case, Deputy Salsman expressed that Mora-Pizarro was not free to go during the stop and

9

in *Hinojosa*, the "Defendant refused to consent to the further search of the residence, which suggests that the environment was not coercive." *Id.* (citing *Hinojosa*, 606 F.3d at 883). Thus, Mora-Pizarro concludes that *Hinojosa* is not dispositive of this case. *Id.* at 8. Alternatively, Mora-Pizarro asserts that all four factors in *Hinojosa* prove that Mora-Pizarro was in custody and should have been advised of his *Miranda* rights, although he does not show how factors one through three prove that he was in custody. *Id.* at 9. Because he was not advised of these rights during the traffic stop, Mora-Pizarro argues that his statements should be suppressed. *Id.*

A criminal defendant must be apprised of his *Miranda* rights before a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966). "However, the obligation to administer a *Miranda* warning to a suspect only arises where there has been such a restriction on a person's freedom as to render him in custody." *United States v. Swanson*, 341 F.3d 524, 528 (6th Cir. 2003) (internal citations and quotation marks omitted). "The 'ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *Id.* at 529 (citations omitted). A person can be detained, like in many traffic stops, but still not "in custody" for purposes of *Miranda* rights. *See id.* at 528; *Berkemer v. McCarty*, 468 U.S. 420, 439–40 (1984).

In *Hinojosa*, the Sixth Circuit provided further guidance as to whether a defendant is in custody for purposes of triggering the *Miranda* requirements. 606 F.3d at 883. The court outlined several factors to be considered, "including (1) the location of the interview; (2) the length and manner of the questioning, (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions." *Id.*

Mora-Pizarro's attempt to distinguish *Hinojosa* is not persuasive. The magistrate judge used *Hinojosa* merely to set forth factors that courts in the Sixth Circuit consider when determining whether a defendant was in custody for purposes of *Miranda*. In setting forth these factors, the Sixth Circuit cited cases that can also be factually distinguished from *Hinojosa*, specifically *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (concerning an un-Mirandized interview lasting 45 minutes to one hour), *Swanson*, 341 F.3d at 529 (concerning an interview taken in a public place), and *United States v. Salvo*, 133 F.3d 943, 950 (6th Cir. 1998) (partially concerning an interview taken in a public place). The magistrate judge did not use the facts of *Hinojosa* in making his determination that Mora-Pizarro was not in custody during the traffic stop. Thus, his reliance on *Hinojosa* was proper.

Moreover, upon de novo review of the applicable case law, this Court finds that the magistrate judge's conclusion was proper. It is undisputed that Mora-Pizarro was not under formal arrest during the traffic stop with Deputy Salsman. Transcript of Hearing 6, 14, ECF No. 232. Thus, this Court must determine whether Mora-Pizarro's freedom of movement was restrained to the degree associated with a formal arrest by applying the factors outlined in *Hinojosa*. *See Swanson*, 341 F.3d at 529; *Hinojosa*, 606 F.3d at 883.

The first factor, the location of the interview, weighs against Mora-Pizarro having been in custody. As discussed in *Berkemer*, "the atmosphere surrounding an ordinary traffic stop is substantially less 'police dominated' than that . . . in the subsequent cases in which we have applied Miranda" because of its public nature. 468 U.S. 438–39. Similarly, in this case, the location of the interview was in a public place, on the side of the interstate. Thus, the first factor weighs against Mora-Pizarro having been in custody.

The second factor, the length and manner of the questioning, also weighs against Mora-Pizarro having been in custody. As to the length, the testimony from the evidentiary hearing does not make clear exactly how long Deputy Salsman questioned Mora-Pizarro. However, Deputy Salsman testified that he stopped Mora-Pizarro around 8:30 am and called KVE two hours later. Transcript of Hearing 15, ECF No. 232. Deputy Salsman and the two other officers did not have any conversations with Mora-Pizarro after he called KVE. *Id.* at 14–15. Within those two hours, Deputy Salsman was searching Mora-Pizarro's tractor-trailer for 45 minutes to one hour. *Id.* at 16. Thus, the questioning likely lasted less than one hour and 15 minutes, taking into consideration the length of the search. Given that Deputy Salsman also took time to review Mora-Pizarro's records in various databases, the questioning was more than likely even less time. The Sixth Circuit has held questioning of such lengths to be non-custodial. *See Panak*, 552 F.3d at 467; *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999). As to the manner of the questioning, Deputy Salsman testified that the tone of their conversation was "very cordial, very friendly" and not contentious in any way. Transcript of Hearing 13, ECF No. 232. Moreover, Deputy Salsman stated that Mora-Pizarro seemed "very friendly, very outgoing, and personable," although he appeared to be nervous. *Id.* at 13–14. Because of the friendly, cordial manner in which the questioning was conducted and the reasonable length of time in which it was conducted, the second factor weighs against Mora-Pizarro having been in custody.

The third factor, whether there was any restraint on the individual's freedom of movement, weighs against Mora-Pizarro having been in custody. Mora-Pizarro was never handcuffed or physically restrained during the questioning. *Id.* at 10. His truck keys were not taken away. *Id.* He was not placed in a law enforcement vehicle. *Id.* Although Deputy Salsman testified that Mora-Pizarro was not free to leave, *id.* at 30–32, such temporary detainment does

not amount to restraint on freedom of movement. *See Swanson*, 341 F.3d at 530. Thus, the third factor weighs against Mora-Pizarro having been in custody.

Finally, the magistrate judge found that the fourth factor, whether the individual was told that he or she did not need to answer the questions, weighs in favor of Mora-Pizarro having been in custody. This Court agrees. The transcript from the evidentiary hearing does not indicate that Deputy Salsman told Mora-Pizarro that he did not need to answer the questions. However, his failure to do so "does not automatically render the encounter custodial. Rather, it is merely one factor among many to be considered." *Hinojosa*, 606 F.3d at 883 (citations and internal quotation marks omitted). Thus, because the other three *Hinojosa* factors weigh against Mora-Pizarro having been in custody, this Court agrees with the magistrate judge in concluding that Mora-Pizarro was not in custody during his traffic stop with Deputy Salsman. The Court will adopt the magistrate judge's conclusion.

Fifth, Mora-Pizarro objects to the magistrate judge's conclusion that there was no violation of Federal Rule of Criminal Procedure 5(a) or of 18 U.S.C. § 3501(c). Obj. R. & R. 10, ECF No. 260. Mora-Pizarro did not raise this argument until after the evidentiary hearing, in his first post-hearing brief. Mem. in Support Mot. Suppress 4–5, ECF No. 240. He asserts that "contrary to the conclusion drawn in the Recommendation, Mora-Pizarro's statements were given more than six hours following his detention." Obj. R. & R. 10, ECF No. 260. He relies on Deputy Salsman's testimony that Mora-Pizarro was not free to leave during his traffic stop (testimony that Mora-Pizarro asserts the magistrate judge ignored in his report and recommendation) to lead him to the conclusion that Mora-Pizarro was detained beginning at 8:30 am, when he was pulled over. *Id.* Mora-Pizarro also relies on the fact that he was not taken before the magistrate judge until the day after his traffic stop. *Id.* Thus, Mora-Pizarro argues that

he "was not promptly taken before a judicial officer and his statement to Perryman should be suppressed." *Id.*

Federal Rule of Criminal Procedure 5(a) requires a person making an arrest to bring "the defendant without unnecessary delay before a magistrate judge." Fed. R. Crim. P. 5(a)(1)(A). Failure to comply with this requirement "renders inadmissible statements obtained from an accused prior to his appearance before a magistrate." *United States v. Barlow*, 693 F.2d 954, 958 (6th Cir. 1982). However, voluntary confessions are admissible despite delay unless that delay is over six hours from the time of arrest or detention and the trial judge determines the delay to be unreasonable. 18 U.S.C. § 3501(c). "For the purposes of Rule 5(a) delay is measured from the time custody by federal authorities commences." *Barlow*, 693 F.2d at 958. Under this analysis, this Court "must find whether the defendant confessed within six hours of arrest . . . If the confession came within that period, it is admissible, . . . so long as it was 'made voluntarily and ... the weight to be given [it] is left to the jury.'" *Corley v. United States*, 556 U.S. 303, 322 (2009). "If the confession occurred before presentment and beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary . . . and if it was, the confession is to be suppressed." *Id.*

Upon de novo review, this Court agrees with the magistrate judge in finding that there was no violation of Federal Rule of Criminal Procedure 5(a) or 18 U.S.C. § 3501(c). Deputy Salsman stopped Mora-Pizarro's tractor-trailer at approximately 8:30 am on May 16, 2013. Transcript of Hearing 16, ECF No. 232. This stop lasted approximately two hours, at which point he called KVE at approximately 10:30 am. *Id.* at 15–16. Although the exact time of Mora-Pizarro's arrest is not in the transcript, he was arrested sometime between 10:30 am and 2:00 pm, when Deputy Perryman first read Mora-Pizarro his *Miranda* rights. *See id.* at 50–51. Deputy

14

Perryman questioned Mora-Pizarro at 2:55 pm for approximately 15-20 minutes. *Id.* at 51, 56. The next day, the magistrate judge signed the criminal complaint and arrest warrant and conducted Mora-Pizarro's initial appearance. Thus, while Mora-Pizarro had to wait until the next day for presentment before a magistrate judge, this time was not spent improperly interrogating Mora-Pizarro in order to coerce him into confessing. *See United States v. Christopher*, 956 F.2d 536, 539 (6th Cir. 1991) ("Finding no malevolent purpose behind the pre-arraignment delay and no lengthy, hostile or coercive interrogation that would have rendered the defendant's statements involuntary, we find no error in the admission of defendant's statements into evidence.") (abrogated on other grounds by *Corley*, 556 U.S. 303). Rather, he gave his statement to Deputy Perryman within six hours of his arrest. Assuming that his arrest happened soon after Deputy Salsman contacted KVE at 10:30 am, he gave his statements to Deputy Perryman within 4.5 hours after his arrest. Thus, even if there were unnecessary delay, his statements were made to Deputy Perryman within the six hour limitation of 18 U.S.C. § 3501(c).

Additionally, a valid *Miranda* waiver may also waive the prompt judicial warning of one's constitutional rights. *Barlow*, 693 F.2d at 959. Particularly where the delay between arrest and presentment was not for the purposes of coercion or intimidation, courts in this circuit will find defendants to have waived their prompt presentment rights. *See United States v. Ostrander*, 411 F.3d 684, 696–97 (6th Cir. 2005) (finding that because the defendant "was not intimidated or physically abused, that he understood what was going on and what his rights were, and that he began to discuss the crime well within the six-hour safe harbor," the defendant's Miranda waiver also waived prompt presentment before the magistrate judge) (citations omitted). There is no evidence in this case that Mora-Pizarro was intimidated or physically abused. Rather, Deputy Perryman described their conversation as being "very amicable" and non-adversarial. Transcript

15

of Hearing 54, ECF No. 232. He also testified that he did not threaten, force, or coerce Mora-Pizarro into making any statements, nor did he see any other officer doing so. *Id.* at 51. Further, there is evidence that he understood what was going on and he understood his rights. He was both told his *Miranda* rights and given the opportunity to read them himself before signing the waiver. *Id.* at 47. Finally, he began to make his statements within six hours of his arrest. Therefore, the Court will adopt the magistrate judge's conclusion on this objection.

V. <u>Conclusion</u>

The Court will adopt the report and recommendation in full. The Court will deny Mora-Pizarro's motion to suppress and supplemental motion to suppress any and all statements that he made to law enforcement on May 16, 2013.

November 18, 2016

**Charles R. Simpson III, Senior Judge**
**United States District Court**